**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF OREGON**

| | |
|---|---|
| **CLIFFORD JOE GRAHAM**, | Case No. 6:21-cv-00390-IM |
| Petitioner, | **OPINION AND ORDER** |
| v. | |
| **JOSHUA HIGHBERGER**, | |
| Respondent. | |

**IMMERGUT, District Judge.**

Petitioner Clifford Joe Graham ("Petitioner"), an individual in custody at Oregon State
Correctional Institution, brings this habeas corpus proceeding pursuant to 28 U.S.C. § 2254.
Because the state court reasonably denied relief on Petitioner's claims, those decisions are
entitled to deference, and the Petition for Writ of Habeas Corpus (ECF No. 2) must be DENIED.

///

///

PAGE 1 – OPINION AND ORDER

## BACKGROUND

In January 2013, Petitioner moved in next door to a family with six children between the ages of four and thirteen. (Resp't Ex. 148 at 3.[1]) Soon thereafter, Petitioner put up a swing in his yard, where the children "frequently" played. (*Id.* at 7.) On March 16, 2013, four of the children—MC, a thirteen-year-old boy; CC, an eleven-year-old boy; KC, a ten-year-old girl; and GC, a nine-year-old boy—disclosed that Petitioner had been touching them sexually and often tried to lure them into his home with candy and Top Ramen. (*Id.* at 3.) Specifically, MC reported that Petitioner had been hugging him, touching his back, and sliding his hands down to MC's buttocks. (*Id.*) MC also reported that Petitioner had told him not to be afraid to kiss him. (*Id.*) CC reported that Petitioner had hugged him and touched his buttocks and that, on one occasion, Petitioner had asked, "How is my little friend?" before touching CC's genitals over his clothing. (*Id.* at 3, 12.) KC reported that Petitioner would "tickle" her chest and told her not to be afraid to hug him. (*Id.* at 3.) Finally, GC reported that Petitioner had hugged him and touched his buttocks, had exposed his penis, and had pornography playing on his television while GC was in his home. (*Id.*)

On April 15, 2013, a Marion County grand jury returned an indictment charging Petitioner with six counts of Sexual Abuse in the First Degree. (Rept's Exs. (ECF No. 29), Ex. 102.) On the advice of his attorney ("trial counsel"), Petitioner agreed to plead guilty to Count 2, which related to CC, and to proceed to a stipulated facts trial on Counts 3, 4, and 5 relating to MC, KC, and GC. (Resp't Ex. 103.) In exchange, the State agreed to dismiss the two remaining counts of sexual abuse (Counts 1 and 6). (*Id.*) Although the parties agreed to open sentencing

---

[1] When citing Respondent's Exhibits, the Court refers to the exhibit page numbers located in the bottom-right corner of each exhibit.

after the completion of a presentencing investigation ("PSI"), the plea petition expressly noted

that Petitioner faced a maximum possible sentence of life in prison pursuant Oregon Revised

Statute ("ORS") § 137.719, a "three strikes" law applicable to certain recidivist sex offenders.[2]

(*Id.*)

On October 17, 2013, Petitioner appeared for a plea hearing in the Marion County Circuit

Court. (Resp't Ex. 104.) After reviewing the plea petition, the trial court confirmed with

Petitioner that he had discussed the matter with trial counsel and was satisfied with his advice,

that Petitioner understood that pleading guilty meant he would waive certain rights, and that no

one had made threats or promises that had influenced his decision to plead guilty. (*Id.* at 9-10.)

After confirming that he understood that the State would be seeking a life sentence, Petitioner

formally entered a guilty plea on the second count of Sexual Abuse in the First Degree. (*Id.* at

12.)

With respect to the remaining counts, Petitioner waived his right to a jury and proceeded

to a stipulated facts trial before the trial court. (*Id.* at 13-15.) During trial, Petitioner agreed that

the State could prove beyond a reasonable doubt that he had knowingly subjected MC, KC, and

GC to sexual contact by touching MC and GC's buttocks and KC's breasts, and that he had

previously been convicted and sentenced for two separate felony sex crimes. (Resp't Exs. 104 at

15-16; 131.) After confirming that Petitioner's decision to proceed on stipulated facts was made

"freely, voluntarily, [and with] full knowledge of what [he was] doing[,]" the trial court found

Petitioner guilty of first-degree sexual abuse on Counts 3, 4, and 5. (Resp't Ex. 104 at 17.)

---

[2] ORS 137.719 provides that the presumptive sentence for a felony sex crime is life in prison without the possibility of parole if the offender has been sentenced for felony sex crimes at least two times prior to the instant offense. OR. REV. STAT. § 137.719(1).

The trial court conducted a sentencing hearing on November 18, 2013. During the

hearing, the State explained that Petitioner previously had been sentenced for first-degree sexual

abuse on separate occasions in 1985 and 1993, and therefore the presumptive sentence was life in

prison under ORS 137.719. (Resp't Ex. 104 at 21.) The State argued that there were "no

mitigating factors [to] allow . . . [for a] downward depart[ure,]" and that several aggravating

factors supported imposing the presumptive sentence in Petitioner's case. (*Id.* at 23.) The State

explained:

> Looking just at the Defendant's criminal history, we're not just looking at
> someone who has two prior convictions for felony sex crimes. We're essentially
> looking at someone who[se] criminal conduct begins as a child, including juvenile
> adjudications for Sex Abuse in the First Degree on two separate occasions.
>
> That continues then all the way into his adult life when his criminal
> history begins again at age 20. And essentially uninterruptedly the Defendant
> continues to commit crimes basically until the instant offense.
>
> The Defendant had only been off parole for a period of months at the time
> of these instant offenses. And what I think the PSI and the State's [sentencing]
> memorandum made clear is that this was a Defendant who was given numerous
> opportunities to be out in the community even on probationary sentences.
>
> I don't believe I found a single one looking at the criminal history, and
> [trial counsel] can certainly correct me if I'm wrong, where the Defendant
> successfully completed probation and successfully completed the affirmative
> obligations of probation.
>
> Instead, somebody who is at least a two-time convicted sex offender,
> felony sex offender as an adult not even counting the juvenile adjudications, who
> has never completed sex offender treatment despite being ordered into it. And
> [has] in fact been found not amenable to any treatment.
>
> And if we look at the aggravating factors, we can see that this is a
> defendant who repeatedly committed crimes while on supervision. Committed
> new sex crimes while on supervision, committed multiple burglary and other
> types of property crimes. His more recent extensive sort of substantial recent
> conviction being for an attempted Kidnapping in the First Degree where he was
> sentenced for 90 months in the Department of Corrections, and it was that parole
> that ended just months shy of the commission of the instant offenses.

And what we see is a pattern of persistently being involved in sex crimes. Sex crimes that persistently targeted young people, and I set forth the facts in the State's memo that were set forth in the PSI.[3] Children as young as six.

We also see him praying on people with mental disabilities. So, he targeted a very vulnerable population, and did that repeatedly. And he did that even while he was being supervised for other crimes. So clearly supervision in our community was not enough to deter his behavior.

More importantly, even having his parole repeatedly revoked, that was not enough to change his behavior, or make the children in this case safe, []or any of the other children in our community.

So, we have somebody who basically is persistently involved, who targets victims who are uniquely vulnerable. Basically, has shown that prior sanctions have had no effect at all and have not changed his behavior at all.

It also I think makes clear that his continued incarceration is necessary for public safety. And I think it also makes clear his complete disregard for following the law.

Additionally, I think what we see when this Defendant is released is not only does he not do his sex offender treatment, . . . [but] he actually [has] been found to be no[t] amenable to treatment, which would be a potential mitigating factor. In fact, he was designated as a predatory sex offender and even then, given his attitude [and] unwillingness to take responsibility, was not deemed . . . a candidate for treatment in that program either.

We basically have someone who has failed over an almost 30-year . . . offending history to take responsibility [and] to abide by conditions of release, and who [has] repeated substantial prison sanctions [and] [h]a[s] done nothing to change his behavior or make him less of a danger to the community.

(*Id.* at 23-27.) The State then reviewed the facts underlying Petitioner's guilty plea and convictions, emphasizing that the instant offenses were simply "a continuation of [Petitioner's] prior criminal history" and that his conduct never "just stopped on its own" without an intervening arrest and period of incarceration. (*Id.* at 28.) In light of these facts and Petitioner's demonstrated history of sexual offenses, the State recommended that the trial court impose a

---

[3] The PSI report is part of the record before this Court and includes a detailed summary of Petitioner's extensive criminal history. (Resp't Ex. 149 at 3-13.)

sentence of life without the possibility of parole pursuant to ORS 137.719 on each of the four counts of sexual abuse. (*Id.* at 29.)

In response, trial counsel urged the trial court to depart downward from the presumptive life sentence, explaining that Petitioner had cooperated so that the child victims would not have to testify; that Petitioner suffered from significant health problems and low-level intelligence; and that Petitioner's conduct was the result of alcohol abuse and misguided attempts to befriend people. (Resp't Ex. 104 at 31-35.) Trial counsel thus suggested that Petitioner's "physical problems, . . . mental functioning level, and . . . cooperat[ion] with the State should perhaps allow the Court to give him something less than could be imposed." (*Id.* at 35.)

The trial court ultimately determined that there were no mitigating factors relating to Petitioner's case. (*Id.* at 36.) The trial court did find, however, that numerous aggravating factors applied to Petitioner's conduct, and that his history as "an unreformed offender" constituted "the type of situation, type of circumstances that ORS 137.719 was designed by the legislature to address." (*Id.*) The trial court thus concluded that there was "nothing in [Petitioner's] past or . . . present behavior which provide[d] any substantial or compelling reasons for a departure from the presumptive sentence envisioned by the legislature[,]" and imposed concurrent sentences of life without the possibility of parole on all four counts. (*Id.* at 36-38; Resp't Ex. 101.)

Petitioner filed a direct appeal, alleging that "[t]he trial court erred in imposing a sentence of life without parole under ORS 137.719" on each of the four counts of first-degree sexual abuse. (Resp't Ex. 105 at 11-12.) Petitioner also assigned as error the trial court's imposition of $8,000 in court-appointed attorney fees. (*Id.* at 25.) In a written opinion, the Oregon Court of Appeals agreed that "the trial court committed plain error by imposing the fees" and reversed that portion of the judgment. *State v. Graham*, 274 Or. App. 718, 719 (2015). The Court of

Appeals rejected the remaining assignments of error without discussion, *id.*, and the Oregon Supreme Court denied review, *State v. Graham*, 359 Or. 166 (2016).

Petitioner next sought post-conviction relief. (Resp't Ex. 111.) In his counseled amended petition, Petitioner alleged that trial counsel was ineffective in several respects, including for "failing to ensure [P]etitioner—who has severe disabilities and cognitive impairment— adequately understood his decisions for his case, and that his stipulated facts plea was voluntary, knowing[], and intelligent." (Resp't Ex. 112 at 4-6.) After a trial during which both trial counsel and Petitioner testified, the postconviction court denied relief. (Resp't Exs. 139 at 48; 140.) Petitioner appealed, but the Oregon Court of Appeals affirmed without opinion, (Resp't Ex. 144), and the Oregon Supreme Court denied review, (Resp't Ex. 145).

On March 12, 2021, Petitioner filed a Petition for Writ of Habeas Corpus in this Court, alleging four grounds for relief:

> **Ground One:** Petitioner's sentences are cruel & unusual under the Eighth and [F]ourteenth Amendments to the United States Constitution.
>
> **Ground Two:** Conviction obtained by plea of guilty which was unlawfully induced or not made voluntarily with understanding of the nature of the charge and the consequences of the plea, in violation of the Sixth and Fourteenth Amendments.
>
> **Ground Three:** Petitioner was rendered ineffective assistance of counsel under the Sixth and Fourteenth Amendments to the United States Constitution . . . when [trial] Counsel failed to ensure that [P]etitioner's [plea was] knowing, intelligent, and voluntary.
>
> **Ground Four:** Petitioner reiterates a[] gound here that has been fully exhausted in the State courts. At the . . . present time, the administration in the institution has confiscated all of Petitioner's legal papers [and he] is filing this petition blindly.

(Pet. at 7-9.) Respondent urges the Court to deny habeas relief, arguing that the state-court decisions denying Grounds One through Three are entitled to deference, that Ground Four is procedurally defaulted and not cognizable in habeas, and that, in the alternative, Petitioner failed

to meet his burden of establishing that he is entitled to habeas relief on Grounds One and Four because he failed to advance the merits of those claims in his supporting brief. (Resp't Resp. to Pet. (ECF No. 12), at 4-5.)

## DISCUSSION

I.      **This Court Must Defer to the State-Court Decision Denying Grounds Two and Three**

In Grounds Two and Three, Petitioner asserts that his pleas were "unlawfully induced or not made voluntarily with understanding of the nature of the charge and the consequences of the plea," and that trial counsel was constitutionally ineffective when he "failed to ensure that [P]etitioner's [plea was] knowing, intelligent, and voluntary." (Pet. at 8.) The state postconviction court denied a similar claim during Petitioner's postconviction proceedings. (Resp't Ex. 140.) Respondent argues that the postconviction court's decision was not contrary to or an unreasonable application of federal law, and therefore it is entitled to deference. This Court agrees.

A.      **Legal Standards**

1.      **Deference to State-Court Decisions Under AEDPA**

The Antiterrorism and Effective Death Penalty Act ("AEDPA") prohibits relitigation of any claim adjudicated on the merits in state court unless such adjudication resulted in a decision that was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or (2) was "based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d). The AEDPA thus imposes "a difficult to meet and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (simplified);

*see also White v. Wheeler*, 577 U.S. 73, 76-77 (2015) (acknowledging that the "AEDPA, by setting forth necessary predicates before a state-court judgment may be set aside, erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court") (simplified).

A state-court decision is "contrary to" clearly established federal law if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [that] precedent." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application" of clearly established federal law occurs if the state court correctly identifies the governing legal principle but misapplies that principle to the facts at hand. *See id.* at 407 (holding that "a state-court decision involves an unreasonable application of this Court's precedent if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case"). The "unreasonable application" clause requires the state court's decision to be more than merely erroneous or incorrect. *See id.* at 411 (noting that "a federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly"). Rather, the state court's application of clearly established federal law must be objectively unreasonable. *See id.* at 409 (instructing that "a federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable").

A federal habeas court may not disturb a state-court decision on factual grounds unless the state court's decision was based on an unreasonable determination of the facts in light of the

evidence before it. 28 U.S.C. § 2254(d)(2). Under the "unreasonable determination" clause, "[t]he question . . . is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). "The petitioner carries the burden of proof." *Pinholster*, 563 U.S. at 181.

### 2.    Ineffective Assistance of Counsel

To prevail on an ineffective assistance of counsel claim, a habeas petitioner must satisfy a two-part test. First, the petitioner must establish that counsel's performance fell below an objective standard of reasonableness. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). Such a showing requires the petitioner to overcome a strong presumption that the challenged conduct falls within the "wide range of reasonable professional assistance; that is the [petitioner] must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689.

Second, a petitioner must demonstrate prejudice: "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." *Id.* Therefore, it is not enough if counsel's errors had only "some conceivable effect on the outcome of the proceeding." *Id.* at 693. However, where, as here, counsel's alleged ineffectiveness arises from the plea process, a petitioner "must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985) In many cases, this prejudice inquiry "closely resemble[s] the inquiry engaged in by courts reviewing ineffective-assistance challenges to convictions obtained through a trial" because whether counsel's errors prejudiced a

petitioner by causing him to plead guilty can depend, in large part, on a prediction about the outcome at a possible trial. *Id.* at 59-60.

Whether in the context of a trial or guilty plea, analyzing an ineffective assistance of counsel claim under the AEDPA is "all the more difficult" because both standards are "highly deferential and when the two apply in tandem, review is 'doubly' so." *Richter*, 562 U.S. at 105 (citations omitted). Accordingly, when considering an ineffective assistance claim under the AEDPA, the relevant question "is not whether counsel's actions were reasonable[,]" but "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

### B.    Analysis

Petitioner argues in his supporting brief that trial counsel was ineffective "when he induced and allowed the entry of guilty and stipulated facts pleas that were not knowing, intelligent, and voluntary." (Pet'r's Br. (ECF No. 51) at 13.) As noted above, Petitioner advanced a similar claim during his postconviction proceedings, arguing that trial counsel was ineffective when he failed to adequately review the stipulated facts or his options for trial; incorrectly advised Petitioner "that he would receive a better deal than a life sentence without parole if he entered into the stipulated facts plea[;]"and failed to ensure that Petitioner had his hearing aids at the plea hearings. (Resp't Ex. 121 at 12.) Petitioner thus argued that his "'choice' to waive his right to trial was based on inadequate representation," and that "[h]ad he known he would face a likely life sentence without parole, [he] . . . would have pursued trial." (*Id.* at 12-13.)

To support his claim, Petitioner submitted the results of an audiological test that occurred approximately one year after his convictions. (Resp't Ex. 115.) The test results indicated that Petitioner suffered from hearing loss in both ears. (*Id.*)

PAGE 11 – OPINION AND ORDER

Petitioner also submitted a psychological evaluation that had been conducted at trial counsel's request by Dr. Jerome Gordon to determine whether Petitioner could aid and assist at trial and whether a mental defense might apply. (Resp't Ex. 147 at 2.) Among other things, Dr. Gordon found that Petitioner "suffers from a mental defect of mild mental retardation and associated cognitive problems" and experiences "auditory hallucinations," including voices that told him that "it is all right for him to do things." (*Id.* at 4-12.) Dr. Gordon also found that Petitioner tends "to be hasty and careless in his decision making and problem solving" because he fails to "take adequate account of information that is important to consider." (*Id.* at 9.) Dr. Gordon thus emphasized in his report that information must "be presented in a language that [Petitioner] understands" and warned that "it may take [Petitioner] more time than it does for most individuals to integrate information and come to decisions." (*Id.* at 9, 12.) Dr. Gordon did not find, however, that Petitioner was unable to aid and assist in his defense or that any viable mental defense applied. (*Id.* at 10-12.)

At his postconviction trial, Petitioner testified that he "could not hear what [was] going on from the judge or the district attorney" during his plea hearing. (Resp't Ex. 139 at 34.) Petitioner also testified that he would not have proceeded to trial if he had known he was facing a sentence of life without parole. (*Id.* at 35.) During closing arguments, Petitioner's postconviction attorney argued that "given the complexity of [Petitioner]'s disabilities and the total lack of investment or basic advocacy by [trial counsel]," Petitioner's plea could not be considered knowing, intelligent, or voluntary. (*Id.* at 40.)

In opposition, the State argued that Petitioner knowingly and voluntarily decided to plead and have a stipulated facts trial as evidenced by the plea and trial transcripts. (Resp't Ex. 124 at 13.) The State pointed out that although Petitioner now claimed that he was unable to hear during

PAGE 12 – OPINION AND ORDER

the plea proceedings, the transcripts demonstrated that he "[a]t no point . . . fail[ed] to answer the questions from the [trial] court, ask[ed] anyone to speak up, or [said] that he could not hear." (Resp't Ex. 124 at 15.) The State also noted that the transcripts showed that the trial court "was aware that [P]etitioner might have trouble understanding" and thus "questioned [P]etitioner extensively, using simple language, to make sure that [P]etitioner's decisions . . . were knowing, voluntary, and intelligent." (*Id.* at 17.)

The State presented additional evidence that Petitioner "was aware of his options and the consequences of his decisions." (*Id.*) For example, the State submitted letters that Petitioner sent the trial court prior to entering his plea, one of which expressly acknowledged that he faced a life sentence. (Resp't Exs. 127, 128.) The State also pointed to Dr. Gordon's evaluation, noting that Petitioner's responses to questioning about the criminal legal system, the plea process, and the pending charges against him demonstrated that he "was able to understand his legal options, if given enough time to process and provided with simple explanations." (Resp't Ex. 124 at 18-19.)

Finally, the State submitted the declaration of trial counsel, who attested that he had "carefully explained" Petitioner's options to him using "simple language" to ensure he understood. (Resp't Ex. 136 ¶ 3.) Trial counsel also acknowledged that Petitioner had a hearing impairment, but explained that information would be repeated in a louder voice if Petitioner had difficulty hearing during the plea proceedings. (*Id.* ¶ 4.) Trial counsel attested that he believed Petitioner's plea was knowing, voluntary, and intelligent, and that he "would not have allowed the stipulated facts trial to proceed if [Petitioner] had not seemed to understand what was happening." (Resp't Ex. 136 ¶¶ 3,4.)

The postconviction court found that there was insufficient evidence to establish that Petitioner could not hear the trial court or the attorneys during his plea proceedings, noting that

PAGE 13 – OPINION AND ORDER

Petitioner had understood and answered "very appropriately" when questioned by the trial court. (Resp't Exs. 139 at 48-50; 140 at 2.) The postconviction court also found that Dr. Gordon's report showed that Petitioner "could aid and assist and understood [the] charges, possible sentence, juries, [and] the role[s] of all the players" that would be involved in a trial. (Resp't Ex. 140 at 2.) The postconviction court thus concluded that "[t]here was no inadequacy in [trial counsel's] representation and no prejudice" and denied relief, explaining the decision to Petitioner during the postconviction trial, as follows:

> I do not find that [trial counsel] was inadequate. I do not find there was prejudice in this case. I -- at least he was able to argue for parole. I think the argument was futile, but at least open sentencing allowed him to argue. . . . .
>
> Mr. Graham, I think your attorney did all that he needed to do, but wasn't able to do any better for you because of your history particularly and the fact that you've been to court before for this kind of behavior and people think you're dangerous. And Courts have already told you that.
>
> So I think [trial counsel] did everything he could do. So I'm not finding that he was a bad lawyer in your case and I'm not finding that he hurt your case.

(Resp't Exs. 139 at 50; 140 at 3.)

The postconviction court's decision was not objectively unreasonable.[4] As Respondent points out, Petitioner established that he suffers from both hearing and cognitive impairments but failed to prove that such impairments caused him to mishear or misunderstand anything material to his decisions to plead guilty to one charge of sexual abuse and to proceed on stipulated facts as to the remaining charges. Indeed, there is ample evidence in the record that Petitioner understood

---

[4] Because the Oregon Court of Appeals affirmed without opinion, this Court must look to the last reasoned decision on the issue, i.e., the postconviction court's denial of Petitioner's ineffectiveness claim. *See Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018) (explaining that where the highest state court issues a decision on the merits unaccompanied by its reasons for the decision, a federal habeas court must "look through" to the last reasoned decision issued in a lower state court, and presume the unexplained decision adopted the same reasoning).

the criminal process, plea bargaining, and the likely sentence he faced if convicted. Prior to his decisions to plead and to proceed on stipulated facts, Petitioner expressly acknowledged to Dr. Gordon that he likely would be found guilty if he went to trial, that he was free to reject a plea bargain, and that "he could get life without parole" if convicted of the four counts of sexual abuse for which he was charged. (Resp't Ex. 147 at 10-12.) Petitioner also sent a letter to the trial court four months before his plea hearing, stating that he was "look[ing] at life [with]out getting out[.]" (Resp't Ex. 128.) Petitioner later signed the plea petition (which included two separate notations that Petitioner faced "life in prison" and a "possible life sentence" pursuant to ORS 137.719), jury waiver, and the trial court questioned Petitioner at length and in simplified terms about his decisions to plead guilty, to waive a jury trial, and to proceed with a stipulated facts trial during the plea hearing. (Resp't Exs. 103; 104 at 7-17; 130-131.) Petitioner responded appropriately to the trial court's questions and confirmed that he understood the trial rights he was waiving, was content with trial counsel's representation and advice, and knew that the State would be "arguing for life" at sentencing. (*Id.*)

On this record, and having considered Petitioner's arguments, this Court cannot conclude that the postconviction court made unreasonable factual determinations or unreasonably applied federal law in determining that Petitioner's decisions to plead guilty and to proceed with a stipulated facts trial was knowing, intelligent, and voluntary, and that trial counsel adequately advised Petitioner with respect to those decisions. Because Petitioner has failed to establish that the postconviction court's ruling was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement[,]" *Richter*, 562 U.S. at 103, it is entitled to deference. This Court thus denies habeas relief as to Grounds Two and Three.

PAGE 15 – OPINION AND ORDER

**II.    Petitioner is not Entitled to Habeas Relief on his Unargued Claims**

Petitioner does not argue the merits of Grounds One and Four in his supporting brief. In addition, Petitioner concedes that the state court's denial of Ground One is entitled to deference, (Pet'r's Br. at 14), and does not challenge Respondent's argument that Ground Four is not cognizable in these proceedings. Habeas relief therefore is precluded as to Grounds One and Four because Petitioner has failed to sustain his burden of demonstrating entitlement to habeas relief on those claims. *See Silva v. Woodford*, 279 F.3d 825, 835 (9th Cir. 2002) (recognizing that a habeas petitioner carries the burden of proving his case).

## CONCLUSION

Based on the foregoing, the Amended Petition for Writ of Habeas Corpus (ECF No. 12) is DENIED, and this proceeding is DISMISSED, with prejudice. Petitioner has not made a substantial showing of the denial of a constitutional right, and therefore this Court DENIES a Certificate of Appealability. *See* 28 U.S.C. § 2253(c)(2).

**IT IS SO ORDERED.**

DATED this ___27th___ day of November, 2023.

Karin J. Immergut
United States District Judge

PAGE 16 – OPINION AND ORDER